# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TANYA BEALS, GERALD BEALS, JR., AND JOSE GRULLON<br><br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A., BAC HOME LOANS SERVICING, L.P.<br><br>Defendants. | Civ. Action No. 10-5427 (KSH)<br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

I. <u>Introduction</u>

The named plaintiffs, Gerald and Tanya Beals and Jose Grullon, are currently in state court foreclosure proceedings brought by defendants Bank of America, N.A. and BAC Home Loans Servicing, L.P.  In their proposed class action lawsuit, plaintiffs assert that defendants engaged in numerous bad practices resulting in unreliable and unfair foreclosure proceedings. Defendants filed a motion to dismiss, arguing that this Court should abstain from considering plaintiffs' claim because of potential conflict with the state court proceedings and, in the alternative, that plaintiffs' complaint should be dismissed for failure to state a claim on which relief can be granted.

II.  Facts and Procedural History

A.  The Pleaded Facts

This case involves Bank of America's mortgage foreclosure practices in the wake of the

financial crisis.  Although the class action focuses broadly on all foreclosure practices, plaintiffs'

claims focus on defects in Bank of America's loan modification procedures.  Because the

plaintiffs have unique factual predicates for their claims, each is discussed separately.  The facts

are derived from the complaint.

1.  Tanya Beals and Gerald Beals, Jr.

Tanya and Gerald Beals ("the Beals plaintiffs") received a loan secured by a mortgage on

their home from Countrywide Financial ("Countrywide"), which Bank of America later

acquired.  (Second Am. Compl. ¶ 142.)  Under this loan, the Beals plaintiffs were obligated to

submit monthly payments of $1,337.08. (*Id.*)  They were unable to make payments, and around

January 2010, they contacted Bank of America to seek a loss mitigation plan.  (*Id.* ¶ 143.)

The parties reached an agreement whereby the Beals plaintiffs would pay $2,000.87 per

month for 12 months.  (*Id.* ¶ 144.)  They received a letter dated March 18, 2010 from Jennifer M.

Morrison, a legal assistant at the law firm representing defendant BAC Home Loan Servicing,

L.P. ("BAC"), a wholly owned subsidiary of Bank of America that operates as its mortgage

servicer.  (Second Am. Compl., Ex. A; Second Am. Compl. ¶ 5.)  The letter directed the Beals

plaintiffs to return an attached proposed Stipulation Agreement with a $4,289.13 payment made

payable to BAC Home Loan Servicing, L.P. (BAC).  (Second Am. Compl., Ex. A.)  The

proposed agreement included blank signature spaces for the Beals plaintiffs and for the

"Representative for Mortgagee."  (*Id.*)  The complaint alleges that before the Beals plaintiffs

received the letter, Morrison represented to them in a conversation that "if [they] executed the

2

proposed stipulation and made timely payments pursuant to that stipulation, . . . BAC would not move forward with any foreclosure proceedings." (Second Am. Compl. ¶ 147.)

The Beals plaintiffs, under the impression "that the modification would become permanent if they fulfilled their modified payment obligations," returned the signed and notarized agreement along with a check for $4,289.13. (*Id.* ¶ 148–49.) BAC cashed the check. (*Id.*) The Beals plaintiffs sent their first monthly payment to BAC, but BAC returned the check "for failure to provide the full amount to cure." (*Id.* ¶¶ 149–51.) In a letter dated May 25, 2010, defendants sent a new proposed agreement that would have mandated $5,734.75 as a down payment and monthly payments of $2,224.60 for the next twelve months. (*Id.* ¶ 152.) The Beals plaintiffs declined to sign this proposal because its terms were less favorable than the earlier agreement. (*Id.*)

On March 9, 2010, defendants initiated foreclosure proceedings. (*Id.* ¶ 153.) That foreclosure action is still pending, and it includes the Beals plaintiffs' counterclaim against BAC for breach of contract, breach of the covenant of good faith and fair dealing, and fraud. (*Id.* ¶ 155; Defs.' Mot. Dismiss, Ex. B at 25–28.) In this action, the Beals plaintiffs allege damages including the costs of defending against the foreclosure proceeding and the costs emanating from the harm to their credit score. (Second Am. Compl. ¶ 156.)

2. <u>Jose Grullon</u>

In July 2005, Grullon obtained a loan from defendants, secured by a mortgage on his home. (*Id.* ¶ 157.) Under this loan, Grullon made monthly payments of $1,995.83. (*Id.*) On April 16, 2009, Mortgage Electronic Registration Systems assigned Grullon's mortgage to Countrywide. (*Id.* ¶ 158.) The assignment of Grullon's mortgage was signed by Renee Hertzler as "Vice President/Compliance Administration Manager for" BAC; in other litigation, Hertzler

testified that she signed thousands of foreclosure documents per month without reading them and without personal knowledge of their truthfulness.  (*Id.* ¶¶ 158–60.)

On July 20, 2009, defendants served Grullon with a foreclosure complaint.  (*Id.* ¶ 161.) Shortly after, he submitted paperwork seeking a loan modification under the Treasury Department's Home Affordable Modification Program ("HAMP").[1]  (*Id.* ¶ 161.)  Defendants rejected Grullon's application.  (*Id.* ¶ 162.)

Grullon and defendants attended a mediation in the foreclosure matter on January 8, 2010, in which they developed and executed a settlement agreement that would have modified Grullon's loan so that he might be able to avoid foreclosure.  (*Id.* ¶ 164.)  The Agreement required Grullon to submit various documents to BAC, at which point BAC would "review and determine" whether a modified payment plan could ensue.  (Second Am. Compl., Ex. C.) Grullon sent the requested documents, but defendants never conducted the follow-up and never sent a written memorialization of the agreement as promised.  (Second Am. Compl. ¶¶ 166–67.) Grullon inquired with BAC several times and was told that his application was being reviewed and that a response would be forthcoming.  (*Id.* ¶ 168.)  In spring 2010, he contacted BAC again and was told that he did not qualify for a modification because he failed to send payments.  (*Id.* ¶ 169.)  A BAC representative also informed Grullon that "he was unaware of any such

---

[1] HAMP is a federal program established in the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008).  The program "is designed to help financially struggling homeowners avoid foreclosure by modifying loans to a level that is affordable for borrowers now and sustainable over the long term."  Home Affordable Modification Program: Overview, Home Affordable Modification Program, Making Home Affordable, https://www.hmpadmin.com/portal/programs/hamp.jsp (last accessed Oct. 26, 2011).  The program sets forth specified classes of eligible borrowers and aims to adjust mortgage payments to an affordable amount given the applicant's income.  *Id.*

agreement and that there was nothing in Mr. Grullon's file indicating the full and complete terms of the January 8, 2010 agreement." (*Id.* ¶ 170.)

The foreclosure action against Grullon remains pending and includes Grullon's counterclaims against BAC for breach of contract, breach of the covenant of good faith and fair dealing, and fraud. (*Id.* ¶ 172; Defs.' Mot. Summ. J., Ex. A at 9–12.) In this action, he alleges damages including harm to his credit score and the costs of defending against the foreclosure proceeding. (*Id.* ¶ 173.)

3. General Allegations Based on Bank of America's Practices

In addition to plaintiffs' individualized complaints regarding their interactions with Bank of America, they also allege broader systemic flaws in the mortgage foreclosure industry. These allegations are more relevant to the broader class action, but they are briefly recounted here because they constitute nearly two-thirds of plaintiffs' complaint.

Plaintiffs allege that in the wake of the financial crisis, Bank of America had to handle an unmanageable quantity of foreclosures, and that to move the process along, the Bank's agents took shortcuts by having so-called robo-signers complete affidavits and other essential foreclosure documents without personal knowledge of the documents' veracity and without verification of the documents' contents. (*Id.* ¶¶ 12–19.) This was not a mere aberration, but rather a standard business practice resulting in thousands of wrongful disclosures across New Jersey and the country. (*Id.* ¶¶ 24–26.) After problems emanating from these practices got out of hand, Bank of America froze foreclosure proceedings in judicial foreclosure states and, later, in all states. (*Id.* ¶ 29.)

Plaintiffs also allege that Bank of America has engaged in wrongful conduct with regard to its handling of loan modification applications. (*See id.* ¶ 37.) Specifically, Bank of America

will frequently solicit mortgagors to participate in a loan modification program and then initiate

foreclosure proceedings against them, delay on making final decision on the modification

applications, and "fail[] to use reasonable efforts to secure investor approval of potential

modifications where such approval is necessary."  (*Id.* ¶ 42.)  Moreover, mortgagors seeking to

check on the status of their modification requests are forced to wait much longer than promised

for final decisions.  (*Id.* ¶ 44.)

      The plaintiffs allege that they and the putative class members have reasonably relied

upon Bank of America's communications in the loan modification process, and that they have

been harmed by Bank of America's actions, especially when they are placed in trial programs

with the erroneous understanding that the modifications will be made permanent.  (*Id.* ¶¶ 51–56.)

Plaintiffs assert that if they had received

> accurate information regarding the status of borrower loans,
> purported defaults, and what measures could be taken to cure the
> defaults or modify the loans, [they] would have pursued other
> measures to cure a potential default, would not have defaulted,
> and/or would not have been led to believe that [Bank of America]
> would assist [them] in order to avoid default.

> *Id.* ¶ 71.

      Plaintiffs support their more generalized allegations through reference to testimony at

congressional hearings from numerous professors and industry experts who have studied

problems in the mortgage servicing industry.  (*See id.* ¶¶ 73–132.)  Additionally, plaintiffs

recount the details of a Legal Services of New Jersey report to the New Jersey Supreme Court;

this report, which recounted details of systemic flaws in the country's mortgage foreclosure

practice, led to a statewide order to show cause directing six lenders, including Bank of America,

to show why their ability to conduct foreclosures should not be suspended in light of these

numerous irregularities.  (*Id.* ¶¶ 133–41.)[2]

---

[2] An initial administrative order signed by Judge Glenn A. Grant, the Acting Administrative Director of the Courts, recounted in depth the flawed foreclosure practices at major financial institutions.  With regard to Bank of America, the order stated:

> As the robo-signing issue drew national attention, a deposition implicating Bank of America came to light, suggesting that Bank of America foreclosed on homes with the aid of documents executed en masse, in the absence of due diligence, by people with no knowledge of the information contained in the documents and no experience in the financial services or mortgage processing industry.  On October 8, 2010, Bank of America Home Loans announced a freeze on foreclosure sales pending a review of foreclosure documents in all fifty states.  The moratorium began in the wake of increased scrutiny surrounding robo-signing practices, as numerous legislators and state prosecutors began investigating foreclosure documentation practices.  On October 18, 2010, Bank of America Home Loans announced that it would resubmit affidavits in 102,000 foreclosure actions in judicial foreclosure states and proceed to resume foreclosure sales.

> *IMO Residential Mortgage Foreclosure Pleading & Document Irregularities*, Admin. Order No. 01-2010, at 5–6 (Dec. 20, 2010).

On August 15, 2011, Judge Richard J. Williams, acting as special master, filed a report on Bank of America following a detailed review of its foreclosure practices.  Judge Williams concluded that BAC "has shown, on a Prima Facie basis, that it has processes and procedures in place which, if adhered to, will ensure that the information set forth in affidavits or certifications submitted in foreclosure proceedings is properly executed and is based upon knowledge gained through a personal review of relevant records which were made in the regular course of business as part of [BAC's] regular practice to make such records."  *IMO Residential Mortgage Foreclosure Pleading & Document Irregularities*, No. F-59553-10, Report of the Special Master Concerning Bank of Am. d/b/a BAC Home Loan Servicing, LP, at 28 (Aug. 15, 2011).  Accordingly, he recommended that BAC "be permitted to resume prosecution of uncontested residential mortgage foreclosure proceedings."  *Id.*  He noted, however, that "nothing in this report and recommendation should be construed as altering or interfering with the right of any party to a foreclosure action to contest the foreclosure in any way that party sees fit."  *Id.*

4. <u>Claim for Relief</u>

The complaint recites seven counts as the basis of the claim for relief: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraud and intentional misrepresentation; (4) constructive fraud and negligent misrepresentation; (5) negligent processing of loan modifications and foreclosures; (6) violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq.*; and (7) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1962 *et seq.*  (*Id.* ¶¶ 181–238.)  Plaintiffs demand, on behalf of themselves and all class members: economic and compensatory damages, actual damages, emotional distress damages, treble damages, punitive damages, declaratory relief "declaring that Defendants' actions are unlawful," injunctive relief "compelling Defendants to cease their unlawful actions," attorneys' fees, and any other relief this Court deems appropriate. (*Id.* at 58–59.)

B. <u>Procedural History</u>

On October 19, 2010, plaintiffs filed their first class-action complaint, which they later amended.  On December 17, 2010, defendants filed a motion to dismiss.  In response, plaintiffs filed a second amended complaint that removed four named plaintiffs from the action, leaving only the three present named plaintiffs: Tanya Beals, Gerald Beals, Jr., and Jose Grullon.

Defendants filed a motion to dismiss the second amended complaint.  On October 17, 2011, this Court held oral arguments.

III. <u>Standard of Review</u>

*Federal Rule of Civil Procedure* 8(a)(2) provides that a claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Rule "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Consequently, mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'" unless the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556–57, 570).  In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

When deciding whether plaintiff has stated a claim on which relief can be granted, the Court "must accept as true all of the allegations contained in a complaint," provided that they are genuine factual allegations and not masked legal conclusions.  *Iqbal*, 129 S. Ct. at 1949–50.

Under *Federal Rule of Civil Procedure* 9(b), a heightened standard applies to an allegation of fraud; in fraud cases, the plaintiff "must state with particularity the circumstances constituting fraud," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  More specifically, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage."  *In re Supreme Specialties, Inc. Securities Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)).  A properly-pleaded fraud claim should "ensure that defendants are placed on notice of the 'precise misconduct with which they are charged'" and should "safeguard defendants against spurious charges."  *Craftmatic Sec. Litig. v.*

9

*Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

IV. <u>Abstention Discussion and Analysis</u>

Defendants argue that this Court should abstain from rendering a decision in this case under four different theories: *Colorado River*, the Anti-Injunction Act, *Younger*, and *Brillhart/Wilton*.

A. <u>*Colorado River* Abstention</u>

Defendants first argue that this Court should abstain from hearing this case under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) because parallel litigation is pending in state court regarding the plaintiffs' foreclosures.

1. <u>Framework</u>

The facts underlying *Colorado River* are helpful in understanding the scope of this abstention doctrine. The state of Colorado established a system in which water rights were adjudicated through a system consisting of "water judges" sitting in seven water divisions. *Colorado River*, 424 U.S. at 804. The United States filed a case in federal court asserting certain water rights. *Id.* at 805–06. "Shortly after the federal suit was commenced, one of the defendants in that suit filed an application in the state court for District 7," seeking to make the United States a defendant in state proceedings for adjudication of the same water rights at issue in the federal litigation. *Id.* at 806. The Supreme Court, looking to "considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,'" developed an abstention doctrine to "avoid duplicative litigation." *Id.* at 814 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). Examining factors relating to the procedural background of each case, the parties' participation,

10

and the convenience of the forum, the Court decided that the federal court should abstain from adjudicating the matter and allow the Colorado state tribunal to assess the water rights at issue. *Id.* at 820.

In the years since *Colorado River*, the doctrine has been refined and the framework generalized for universal application. First, there must be a "parallel state proceeding" raising "substantially identical claims [and] nearly identical allegations and issues." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009) (quoting *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (2005)). If a parallel state proceeding is pending, then six factors must be considered to determine whether abstention is appropriate: "(1) [in an *in rem case*,] which court first assumed jurisdiction over the property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties." *Id.* at 308 (quoting *Spring City Corp. v. Am. Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir. 1999)). Underlying the analysis is that abstention doctrines are "narrowly applied in light of the general principle that 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" *Id.* at 307 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)).

a.   Parallel Proceedings

The two sets of proceedings here are similar, with many facts common between them, but they are not parallel. "Parallel cases involve the same parties and 'substantially identical' claims, raising 'nearly identical allegations and issues.'" *Yang*, 416 F.3d at 204 n.5 (quoting *Timoney v. Upper Merion Twp.*, 66 F. App'x 403, 405 (3d Cir. 2003)). These cases are not identical. Most notably, this is a class action and the state foreclosure actions involve only the named plaintiffs.

11

Although the plaintiffs in this case have included counterclaims in state court for breach of contract and fraud, this case includes three claims not present in the state litigation: a claim for negligent processing of loan modifications, and statutory claims under the New Jersey Consumer Fraud Act and the Fair Debt Collection Practices Act. *See Dehart v. US Bank, N.A.*, No. 10-5869, 2011 WL 3651270 (D.N.J. Aug. 18, 2011) (Simandle, J.) (declining to exercise *Colorado River* abstention in FDCPA case where FDCPA was not asserted as affirmative defense in state foreclosure proceeding). *But see St. Clair v. Wertzberger*, 637 F. Supp. 2d 251, 255 (D.N.J. 2009) (Hillman, J.) (abstaining because "[i]f the Court were to find that defendants violated the FDCPA by improperly instituting the state foreclosure action, such a finding would be an impermissible direct contradiction of the final judgment of foreclosure, if it is entered.").

It is impossible to ignore the obvious: much of this case will involve issues similar to those at play in the state foreclosure litigation. Four of plaintiffs' claims in this case are asserted as affirmative defenses in the state foreclosure litigation, and the facts in both cases will revolve around whether Bank of America and BAC utilized slipshod or deceitful mortgage servicing practices. Nevertheless, this is principally an action for damages against defendants for their conduct, whereas the state action will focus primarily on whether defendants are entitled to foreclose on plaintiffs' property. The mere existence of similarities and common issues does not make the cases substantially identical.

    b.  Six-Factor Analysis

Even if the proceedings are deemed to be parallel, the six-factor test nevertheless weighs against abstaining from this case.

i.   Jurisdiction over the Property

This action is *in personam*, but the state foreclosure action is *in rem*.  The state obtained

jurisdiction over the home first, and "the presence of an *in rem* dispute in the state court action

weighs in favor of abstention."  *BIL Mgmt. Corp. v. N.J. Econ. Dev. Auth.*, 310 F. App'x 490,

492 (3d Cir. 2008) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

14–15 (1983)).

ii.   Convenience of the Federal Forum

Defendant emphasizes that the state courts provide specific resources for parties in

foreclosure disputes, but that argument misapprehends the relevant inquiry.  The issue is not

which forum is superior but whether the federal forum is inconvenient.  For example, in

*Colorado River* itself, the Supreme Court analyzed this factor based on "the 300-mile distance

between the District Court in Denver and the court in Division 7."  424 U.S. at 820.  The federal

forum here is not inconvenient for any of the parties, and this factor therefore weighs against

abstention.

iii.   Desirability of Avoiding Piecemeal Litigation

"[T]he mere possibility of piecemeal litigation" does not make abstention automatically

appropriate; "rather, there must be a strongly articulated *congressional policy* against piecemeal

litigation in the specific context of the case under review."  *Ryan v. Johnson*, 115 F.3d 193, 198

(3d Cir. 1997); *see also Spring City Corp.*, 193 F.3d at 171–72 ("*Colorado River* abstention must

be grounded on more than just the interest in avoiding duplicative litigation.").  Defendants have

identified no congressional policy against piecemeal litigation in this context.

In addition to the absence of a congressional policy, the class action nature of this suit

makes piecemeal litigation almost a necessity.  The plaintiffs cannot bring a class-action

counterclaim in their individual foreclosure actions. Because the people most heavily affected by defendants' practices are those subject to foreclosure, defendants' interpretation of the avoidance-of-piecemeal-litigation factor would mean that each foreclosure defendant would need to bring these claims as counter-claims and affirmative defenses in state court or else surrender them as defenses to the foreclosure action. In so doing, they would effectively be locked out of participation in a subsequent class action, as res judicata would apply after the state court reached a conclusion. Accordingly, this factor weighs against abstention.

      iv.    <u>Order of Jurisdiction</u>

The state courts had jurisdiction over this matter first, as foreclosure actions began before this complaint was filed. This factor weighs in favor of abstention.

      v.    <u>Federal or State Law Controls</u>

Most of the claims are based on state law, but plaintiffs' FDCPA claim is based on federal law. The presence of a federal claim militates against a district court's "surrender" of jurisdiction. *Moses H. Cone*, 460 U.S. at 26.

      vi.    <u>Adequate Protection in State Court</u>

As discussed above, the state court proceedings do not provide for class action relief. Although they are otherwise capable of protecting the interests of the named plaintiffs in this litigation, the inability to take advantage of the class action mechanism means that this factor weighs against abstention.

      vii.    <u>Conclusion</u>

Of the six *Colorado River* factors, two favor abstention. Given the principle that courts should apply abstention doctrines narrowly to avoid unnecessary surrenders of jurisdiction, *see*

*Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 307, abstention is not appropriate under these circumstances.

B.  <u>The Anti-Injunction Act</u>

The Anti-Injunction Act, 28 U.S.C. 2283, provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Though the statute speaks only of injunctive relief, when "declaratory relief would produce the same effect as an injunction, a declaratory judgment is barred if section 2283 would have prohibited an injunction." *U.S. Steel Corp. Plan for Emp. Ins. Benefits v. Musisko*, 885 F.2d 1170, 1175 (3d Cir. 1989) (citing *Thiokol Chem. Corp. v. Burlington Indus., Inc.*, 448 F.2d 1328, 1332 (3d Cir. 1971), *cert denied*, 404 U.S. 1019 (1972)).

The plaintiffs in this case do not seek to enjoin the state court proceedings; they seek an injunction "compelling Defendants to cease their unlawful actions" and a declaratory judgment "declaring that Defendants' actions are unlawful." (Second Am. Compl. at 58–59.) If this Court granted that relief, the judgment would impose no direct restriction on the ability of the state court to proceed with its case, as the relief focuses on defendants' unlawful conduct, not the state court proceedings. *Cf. Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970) ("Both sides agree that although this federal injunction is in terms directed only at the railroad it is an injunction 'to stay proceedings in State court.' It is settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding."). Accordingly, the Anti-Injunction Act poses no bar to this Court's consideration of this case.

15

C. *Younger* Abstention

Defendants next argue that this Court should abstain under *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention requires district courts to abstain from exercising jurisdiction "over a particular claim where resolution of that claim would offend principles of comity by interfering with an ongoing state proceeding." *Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010). Specifically, *Younger* prevents federal courts "from enjoining pending state proceedings absent extraordinary circumstances." *Gray v. Pagano*, 287 F. App'x 155, 157 (3d Cir. 2008) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 437 (1982)). It "is appropriate only when the following three requirements are satisfied: (1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise the federal claims." *Id.* (citing *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005)). Even assuming arguendo that these elements are satisfied, *Younger* abstention is inapplicable to this situation; like the Anti-Injunction Act, *Younger* operates to prevent federal courts from enjoining state proceedings. *See Middlesex Cnty. Ethics Comm.*, 457 U.S. at 431 (stating that *Younger* "espouse[s] a strong federal policy against federal-court interference with state judicial proceedings absent extraordinary circumstances"). As discussed above, plaintiffs' desired relief would not interfere with state foreclosure proceedings. Therefore, just as abstention was not necessary under the Anti-Injunction Act, it is also not warranted under *Younger*.

D. *Brillhart/Wilton* Abstention

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an

16

appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  In *Brillhart v. Excess Insurance Co.*, 316 U.S. 491 (1942), the Supreme Court made clear that "the district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  This discretion emanates from the language of the Declaratory Judgment Act, which creates a "textual commitment to discretion" through its use of the word "may" in establishing district court jurisdiction over claims for declaratory relief.  *Id.* at 286.

When a decision on whether to hear an action for declaratory relief is premised on the pendency of state court proceedings, the court's decision to exercise jurisdiction should be based upon an examination of "the scope of the pending state court proceeding and the nature of the defenses open there," with an emphasis on "whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, etc."  *Brillhart*, 316 U.S. at 495.  In the end, "a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close."  *Wilton*, 515 U.S. at 288.

Because abstention is not warranted under *Colorado River*, the Anti-Injunction Act, or *Younger*, this Court already must decide the merits of plaintiffs' claims for monetary and injunctive relief.  It makes little sense to surrender jurisdiction over the claim for declaratory relief, as all the pertinent issues presented in that demand will need to be decided anyway.  Accordingly, this Court will not apply *Brillhart*/*Wilton* abstention.

17

V.  <u>Failure to State a Claim Discussion and Analysis</u>

Defendants seek to dismiss each of plaintiffs' seven counts for failure to state a claim.

A.  <u>Breach of Contract</u>

1.  <u>Framework</u>

To state a claim for breach of contract, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom, and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  "As a general rule, courts should enforce contracts as the parties intended." *Pacifico v. Pacifico*, 190 N.J. 258, 266 (2007).  When interpreting a contract, a court's goal is to "discern and implement the common intention of the parties." *Id.* (citing *Tessmar v. Grosner*, 23 N.J. 193, 201 (1957)).

This motion to dismiss, strictly speaking, is not about contractual interpretation so much as it concerns whether the parties ever entered loan modification agreements in the first place. The traditional elements of a contract are offer, acceptance, and consideration.  *Creek Ranch, Inc. v. N.J. Tpk. Auth.*, 75 N.J. 421, 430 (1978).  A contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty,'" and the parties must "agree on essential terms and manifest an intention to be bound by those terms." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (quoting *Borough of W. Caldwell v. Borough of Caldwell*, 26 N.J. 9, 24–25 (1958)).

In this case, defendants contend that their interactions with the plaintiffs were just negotiations and that defendants never manifested an intention to be bound by any agreement. Because there are substantial variations in the facts underlying the Beals plaintiffs' experience and Grullon's experience, each is addressed separately.

18

2.  <u>The Beals Plaintiffs' Contract</u>

According to the complaint, after the Beals plaintiffs fell behind on their payments, they entered negotiations for a loan modification.  A legal assistant at BAC's law firm told the Beals plaintiffs that "if [they] executed the proposed stipulation and made timely payments pursuant to that stipulation, . . . BAC would not move forward with any foreclosure proceedings."  (Second Am. Compl. ¶ 147.)  That same legal assistant signed a letter to the Beals plaintiffs, dated March 18, 2010, which stated:

> Enclosed please find a proposed Stipulation Agreement relative to the above-referenced account.  Please execute the same and return the fully executed and notarized Stipulation Agreement and the $4,289.13 down payment in the form of certified funds made payable to 'BAC Home Loan Servicing, L.P.' to the undersigned on or before March 30, 2010.

> (Second Am. Compl., Ex. A.)

The enclosure with that letter was a document titled "Stipulation Agreement" that set forth, in detail, the Beals plaintiffs' responsibilities under a modified payment schedule.  (Second Am. Compl., Ex. B.)  At the end of the agreement, there were three blank lines: one designated for a "Representative of the Mortgagee" and one for each of the Beals plaintiffs.  (*Id.*)

The Beals plaintiffs executed and notarized the document and returned it with a check for the down payment of $4,289.13, which BAC cashed.  (Second Am. Compl. ¶¶ 148–49.)  When they sent their first monthly payment, BAC returned it and sent a new proposed agreement with higher down payment and monthly payment requirements.  (*Id.* ¶ 152.)  The Beals plaintiffs never acted upon the new proposal.  (*Id.*)

The complaint sets forth sufficient information to permit a reasonable inference that the Beals plaintiffs and BAC entered a contract with the intention to be bound.  The factual

assertions are that the Beals plaintiffs spoke with representatives of the defendants regarding a modification and were orally assured that they would not be subject to foreclosure if they executed the proposed agreement.  Neither the agreement nor the letter accompanying the agreement mentioned the possibility that defendants — who drafted and proposed the agreement — might reject it or withhold the right of final approval.  This understanding is further bolstered by the letter accompanying the agreement, which instructed the Beals plaintiffs to submit the down payment within two weeks, just as the proposed agreement required.  They complied, and defendants cashed their check.  According to the complaint, no information was provided regarding why this check was cashed or why the Beals plaintiffs never received any immediate rejection notice.  The Beals plaintiffs did not learn that defendants did not consider the agreement binding until they submitted a monthly payment only to see it rejected and returned along with a new proposed agreement.

Defendants emphasize two points: that the cover letter described the agreement as only a "*proposed* Stipulation Agreement" and that no representative of theirs ever attached a signature to the agreement after the Beals plaintiffs returned it.  First, the use of the word "proposed" appears to cut in favor of, not against, the idea that the agreement was an offer; the most natural way to read the language is to view it as defendants' "proposal" to the Beals plaintiffs.  Second, the failure to sign the document is not dispositive.  Defendants' decision to cash the Beals plaintiffs' check and remain silent for over a month, without any indication that the agreement was still under review, is a sufficiently meaningful signal of an intention to be bound to state a claim for breach contract.

3.  <u>Grullon's Contract</u>

Grullon and defendants developed a settlement agreement at mediation in state foreclosure proceedings.  (Second Am. Compl. ¶ 154.)  Grullon's agreement, however, was far less definite than the Beals plaintiffs' agreement.  It specified that within one week of the mediation, Grullon must provide certain financial documents to defendants, and that "[u]pon receipt of the above documents. [BAC] will review and determine if offer on the terms discussed at the . . . mediation will be provided."  (Second Am. Compl., Ex. C.)  The writing was on a boiler plate form titled "Foreclosure Mediation Settlement Memorandum," and the parties physically crossed out two pre-typed clauses that would have made the memorandum a binding settlement.  (*Id.*)  In the week after the meeting, Grullon repeatedly contacted BAC and was told that his application was still being reviewed.  (*Id.* ¶ 168.)  The following spring, he was told he did not qualify for a modification.  (*Id.* ¶ 169.)

The complaint does not allege sufficient facts to find that Grullon and defendants had a contract.  The agreement at the mediation was expressly conditioned on BAC's review of his financial documents, and the complaint does not indicate that BAC ever said anything to suggest that it had manifested its assent to be bound by that agreement.  Grullon points to the memorandum's requirement that BAC send Grullon a written document within one month, which it never did.  But like the rest of the agreement, that requirement was conditioned on BAC's approval based on Grullon's financial documents.  Thus, Grullon and defendants started negotiations and laid the groundwork for an agreement, but the complaint fails to assert facts raising the inference that they had a meeting of the minds sufficient to form an actual contract.

B. <u>Implied Covenant of Good Faith and Fair Dealing</u>

Defendants claim that plaintiffs have failed to state a claim for a breach of the implied duty of good faith and fair dealing. "Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005). This duty "calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." *Id.* at 224–25 (quoting *Palisades Props., Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). When claiming a breach of the covenant, a plaintiff must show "proof of bad motive or intention . . . sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at 225 (quoting *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001), and 23 *Williston on Contracts* § 63:22, at 513–14 (Lord ed. 2002)).

As a preliminary matter, because the duty of good faith and fair dealing applies only to parties to a contract, Grullon has failed to state a claim because, as discussed above, he and defendants never entered a contract other than the original mortgage.

The Beals plaintiffs allege that defendants violated their duty of good faith and fair dealing

> by failing to take reasonable measures to insure that they collected and/or attempted to collect the proper sums from Plaintiffs and Class Members; by failing to make good faith efforts to provide the loan servicing functions owed to Plaintiffs and the Class in connection with their review and retention of documentation, including loan modification applications; by initiating foreclosure proceedings without cause; by failing to comply with negotiated and binding settlement agreements; and by allowing the practice of robo-signing to take place with respect to foreclose proceedings.

22

(Second Am. Compl. ¶ 201.)

In their brief, the Beals plaintiffs emphasize two specific ways the breach occurred: first, defendants' "fail[ed] to communicate with or adequately supervise foreclosure attorneys and employees . . . so that Plaintiffs were not protected from the foreclosure activity during the process of modification of the mortgages"; second, the Beals plaintiffs allege that defendants violated the duty "by failing to hire sufficient staff, by losing documents, repeatedly requesting documents it has already received, giving conflicting and confusing instructions to borrowers, not responding to borrowers inquiries, and making mistakes in processing documents." (Pls.' Br. Opp. Mot. Dismiss 20–21.)

The Beals plaintiffs have set forth sufficient allegations to support their claim for a breach of the duty of good faith and fair dealing. After they entered into the modification contract, the defendants accepted the down payment under that agreement but then sought to compel the Beals plaintiffs to disregard that agreement and enter a new modification plan with terms less favorable than the earlier one. In so doing, defendants used their bargaining position to attempt to undermine the already-existing contract, thus undermining the Beals plaintiffs' ability to enjoy the benefits of the earlier bargain. Given the assurances they received regarding the earlier proposed agreement, an inference of bad faith on defendants' part may be drawn. Accordingly, the motion to dismiss the Beals plaintiffs' claim for a breach of the duty of good faith and fair dealing is denied.

C.  Fraud and Negligent Misrepresentation

1.  Framework

Intentional fraud consists of five elements: "(1) a material misrepresentation of presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172–73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).  As discussed above, claims of fraud must be pleaded with particularity.  *See Fed. R. Civ. P.* 9(b).

Negligent misrepresentation is "'[a]n incorrect statement, negligently made and justifiably relied on,' which results in economic loss." *McClellan v. Felt*, 376 N.J. Super. 305, 313 (App. Div. 2005) (quoting *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000)).  It is essentially the same claim as fraud, except that it requires a scienter only of negligence.  Negligent misrepresentation does not have a heightened pleading standard.

2.  The Beals Plaintiffs' Claim

The first element of a claim for either fraud or negligent misrepresentation is a material misrepresentation of presently existing or past fact.  The Beals plaintiffs allege that they were the victim of one material misrepresentation: a legal assistant at the law firm that initiated the foreclosure action informed them that if they executed the proposed stipulation agreement and made timely payments, foreclosure would not ensue.  (Compl. ¶ 147.)  Defendants contend that this was merely a contingent future fact that cannot be considered a misrepresentation for purposes of finding fraud.  But though the legal assistant was referring to a future event, the statement is nevertheless a misrepresentation if it was a "[m]isrepresentation of a present state of mind, with respect to a future matter." *See Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J.

24

Super. 369, 381 (App. Div. 1960); *see also Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1031 (D.N.J. 1995) ("[W]here a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud, etc.").  The intention to misrepresent a present state of mind "may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise." *Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388, 396 (App. Div. 1989); *see also Luscko v. S. Container Corp.*, 408 F. App'x 631, 634–35 (3d Cir. 2010) (same).  Because the information that the legal assistant provided to the Beals plaintiffs was so inconsistent with what actually ensued, the complaint sets forth a sufficient factual basis to raise inference that her intentions were dependent upon contingencies known only to her.

The second element of a claim for fraud is knowledge or belief of falsity.  The legal assistant provided the Beals plaintiffs with a very firm assurance that did not reflect the actual way that defendants handled the matter.  For the same reasons that it possible to infer the legal assistant's intention to misrepresent her present state of mind, it is reasonable to infer that she knew that the modification would not be automatic.  This same assertion also allows for an inference that the statement was "negligently made" and so satisfies the second element of the Beals plaintiffs' claim for negligent misrepresentation.

The third element of a claim for fraud is that the party making the misstatement must have intended that the recipient of the information rely on it.  The legal assistant told the Beals plaintiffs that if they executed the proposed agreement and returned it with the down payment,

their house would not be foreclosed upon.  In context, the inference is that she made this statement to induce reliance and get a check from borrowers, and this element is therefore satisfied.

The fourth element of a claim for fraud (and the third element of a claim for negligent misrepresentation) is that the recipient of the statement must reasonably rely upon it.  The Beals plaintiffs specifically pleaded reliance on the legal assistant's representation (Second Am. Compl. ¶ 148), and it is reasonable that the Beals plaintiffs would rely on a representative of defendants' law firm to explain defendants' bargaining intentions.

The final element of both a claim for fraud and a claim for negligent misrepresentation is that the plaintiff must have suffered damages as a result of the statement.  Although the Beals plaintiffs claim that they suffered damages including harm to their credit scores and the cost of having to defend against wrongful foreclosure (*id.* ¶ 156), it is sufficient for present purposes to note that absent the legal assistant's assurances regarding defendants' willingness to enter a modification agreement, the Beals plaintiffs would not have tendered the check for the down payment to defendants.  Even though the Beals plaintiffs owed that money to defendants anyway because they were behind on foreclosure payments, the Beals plaintiffs allege that defendants compelled them to produce the down payment immediately through assurances of a loan modification, constituting damages sufficient to state a claim for fraud.

3. <u>Grullon's Claim</u>

The first element of a claim for either fraud or negligent misrepresentation is a material misrepresentation of presently existing or past fact.  Here, the complaint alleges that defendants conveyed several facts to Grullon that combine to constitute a material misrepresentation of fact. Grullon alleges that the attesting secretary to the Assignment of Mortgage from MERS to

Countrywide has been revealed in other litigation to be a "robo-signer." (S*ee id.* ¶¶ 158–60.) Defendants accurately point out that Grullon has not alleged that his assignment was defective in a substantive way.  But even though Grullon was indisputably in default and the "robo-signing" might involve only the question of who could properly foreclose, the validity and legitimacy of assignment documents are an important part of the foreclosure process, as made clear through the New Jersey Supreme Court's decision to take a close look at the state's foreclosure practices as a result of defective signing practices.  *See IMO Residential Mortgage Foreclosure Pleading & Document Irregularities*, Admin. Order No. 01-2010 (Dec. 20, 2010).  Despite the possibility that "robo-signing" made invalid part of the foreclosure documentation, defendants entered into negotiations with Grullon to seek a modification agreement.  Although this did not result in a formal contract, it resulted in a very detailed arrangement in which Grullon was at least promised "a more formal written agreement within 1 month" of defendants' receipt of his financial documents.  (Second Am. Compl., Ex. C.)  Grullon never received that formal writing.  Taking all these facts together, Grullon has put forth sufficient information to suggest that notwithstanding potentially deficient practices underlying the assignment of his mortgage, he was subject to a foreclosure suit and then engaged in negotiations that did not result in a finalized contract, but did create the reasonable impression that a modification would be agreed upon following approval of Grullon's financial documents.  In essence, the complaint alleges that Grullon was led down a path to believe that he was subject to foreclosure but that defendants would agree to (or at least seriously consider) a modification.  Given that defendants' behavior after the mediation was so inconsistent with their assurances at mediation, a material misrepresentation can be inferred for purposes of determining whether Grullon has stated a claim.

The second element of a claim for fraud is knowledge or belief of falsity.  For the same reason that defendants' statements regarding their intended conduct permits an inference of a material misrepresentation, knowledge of the falsity of that statement has also been adequately pleaded.  This same information also allows for an inference that the statement was "negligently made" and therefore satisfies the second element of Grullon's claim for negligent misrepresentation.

The third element of a claim for fraud is that the party making the misstatement must have intended that the recipient of the information rely on it.  As in the case of the Beals plaintiffs, the reasonable inference to be drawn from the facts as pleaded is that defendants told Grullon that they were considering a modification in order to compel him to act in reliance on that assurance.

The fourth element of a claim for fraud and the third element of a claim for negligent misrepresentation is that the recipient of the statement must reasonably rely upon it.  The complaint puts forth adequate information to demonstrate that Grullon relied upon these assurances.  He submitted the requested documents and repeatedly attempted to contact defendants to determine the status of his application.  (*See* Second Am. Compl. ¶¶ 166, 168–70.)

The final element of both a claim for fraud and a claim for negligent misrepresentation is that the plaintiff must have suffered damages as a result of the statement.  Here, Grullon suffered damages in having to defend against the foreclosure and in losing other options to avoid foreclosure if, as alleged, the assignment of his mortgage was defective.  (*See id.* ¶ 43 (alleging generally that "borrowers, who have been forestalled from attempting to pursue other options to prevent delinquency on their mortgage payments end up in default through no fault of their own").)

Accordingly, Grullon has put forth a sufficient claim for fraud and negligent misrepresentation, and the motion to dismiss those claims is denied.

D.  Negligent Processing of Loan Modifications

Plaintiffs put forth a claim for negligent processing of loan modifications.  Negligence consists of four elements: "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages."  *Polzo v. Cnty. of Essex*, 196 N.J. 569, 584 (2008) (quoting *Weinberg v. Dinger*, 106 N.J. 469, 484 (1987)).

Plaintiffs argue that defendants' duty to borrowers emanates from the testimony of Bank of America executives before Congress, in which one stated that Bank of America has a

> responsibility to be fair, to be responsive and, where a foreclosure is unavoidable, to treat customers with respect as they transition to alternative housing.  [Bank of America], and those who work with [the company] in connection with foreclosure proceedings, also have an obligation to do our best to protect the integrity of those proceedings.

(Second Am. Compl. ¶ 125.)

Even if this language is more than aspirational, plaintiffs have not explained how the executives' statements to Congress create a legally cognizable duty under New Jersey tort law.

The duties described are those that Bank of America owes not to the public at large, but rather to its borrowers pursuant to contract.  "Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002).  If a court cannot "discern any duty owed to the plaintiff that is independent of the duties that arose under the contract," a plaintiff has not stated a claim for negligence.  *Id.*  Here, even if defendants were negligent, plaintiffs' damages "do not arise from any duty imposed by law but rather result from [the]

alleged breach of contract." *Id.* at 318; *see also Perkins v. Wash. Mut., FSB*, 655 F. Supp. 2d 463, 471 (D.N.J. 2009) (Irenas, J.) ("[M]ere failure to fulfill obligations encompassed by the parties' contract, including the implied duty of good faith and fair dealing, is not actionable in tort.").

Plaintiffs cite two cases to support the existence of a duty, but those cases involved claims for fraud, not negligence. *See City of Millville v. Rock*, 683 F. Supp. 2d 319 (D.N.J. 2010) (Rodriguez, J.) (claim for fraudulent failure to disclose); *United Jersey Bank v. Kensey*, 306 N.J. Super. 540 (App. Div. 1997) (claim for fraudulent inducement and concealment via failure to disclose), *certif. denied*, 153 N.J. 402 (1998).

Because defendants owe plaintiffs no duty independent of the contract, plaintiffs have not stated a claim for which relief can be granted.

### E.  New Jersey Consumer Fraud Act

A claim under the New Jersey Consumer Fraud Act ("CFA") consists of three elements: "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss.'" *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (quoting *Lee v. Carter-Reed Co.*, 203 N.J. 496, 521 (2010)).  The CFA defines an "unlawful practice" as

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived, or damaged thereby.

N.J.S.A. 56:8-2.

The parties first contest whether the mortgage foreclosure modifications at issue in this case are "in connection with the sale or advertisement of any merchandise or real estate." At the time the briefs were filed, this was a fairly open question. But last August, the New Jersey Supreme Court issued an opinion on a similar issue in *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557. In *Gonzalez*, a bank went to court and obtained a judgment of foreclosure against the plaintiff. 207 N.J. at 566. The plaintiff entered an agreement with the bank's servicing agent, under which the servicer agreed that it would not proceed with a sheriff's sale so long as plaintiff agreed to make a lump sum payment followed by monthly payments for the next 20 months. *Id.* Plaintiff missed four payments and the parties negotiated a new modified agreement. *Id.* at 566–67. In reaching this agreement, the servicer met with plaintiff, who had a sixth grade education and could not speak or read English, without contacting her attorney from the earlier negotiations. *Id.* at 567. Plaintiff made all the required payments, but the servicer inexplicably considered her behind on the loan and did not dismiss the foreclosure action as it had agreed to do. *Id.* Plaintiff filed a complaint under the CFA. The New Jersey Supreme Court held that "post-judgment agreements, standing alone, constitute the extension of credit, or a new loan, and that [servicer's] collection activities may be characterized as 'subsequent performance' in connection with the extension of credit." *Id.* at 581 (quoting N.J.S.A. 56:8-2). The agreements "retained every characteristic of the initial loan — and more," as plaintiff had to pay additional fees, costs, and interest on top of the original loan and arrearages. *Id.* at 581–82.

Although no judgment has been entered against the plaintiffs in the present case, the same principle applies. The Beals plaintiffs and Grullon had a mortgage with Bank of America, and after they fell behind on payments, the servicer negotiated with them regarding a modified

payment plan.  Just as the post-judgment agreement was covered under the CFA, so too are the modifications here, which effectively operate as a subsequent performance on the original agreement.  Therefore, plaintiffs have properly pleaded an "unlawful purpose."

*Federal Rule of Civil Procedure* 9(b) applies to CFA claims.  *See Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 296 (D.N.J. 2009) (Wolfson, J.).  For the same reasons that the plaintiffs have pleaded claims for common law fraud, so too have they put forth adequate claims to satisfy the second and third elements of a claim for a violation of the CFA.

F.   Fair Debt Collection Practices Act

1.   Statute of Limitations

Defendants allege that plaintiffs' Fair Debt Collection Practices Act ("FDCPA") action is barred by the statute of limitations.  An action under the FDCPA must be brought "within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).  Defendants focus on the discrete moment when the fraud allegedly occurred: the filing of false affidavits in connection with Grullon's foreclosure and the erroneous communication regarding BAC's willingness to go forward with a permanent modification on the Beals plaintiffs' mortgage. Because the "false representation or deceptive means" to collect the debt is still ongoing in the form of the pending foreclosure actions, the accrual period has not yet begun, and the FDCPA claims are not time-barred.

2.   Whether Defendants Are "Creditors" or "Debt Collectors"

a.   Framework

Under the FDCPA, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e. Among a non-exhaustive list of specifically banned practices is "[t]he use of any false

32

representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). The Act also provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

The parties contest whether Bank of America and BAC qualify as "debt collectors" under the Act. A debt collector is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). However, a debt collector "does not include . . . any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." 15 U.S.C. § 1692a(6)(A). A "creditor," in turn, is "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692(a)(4).

Pursuant to the words of the statute, courts have concluded that "an assignee of an obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment." *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir 2000). But "an assignee may be deemed a 'debt collector' if the obligation is already in default when it is assigned." *Id.* Thus, it is automatic that an assignee who obtains the rights to the loan before the mortgagor defaults is a creditor. *See Robbins v. Mortg. Elec. Registration Sys., Inc.*, No. 09-295, 2009 WL 3757443 (W.D. Mich. Nov. 9, 2009) (holding that mortgage servicers are not "categorically exempt from liability under the FDCPA," but that "a mortgage servicing company is exempt *if* the mortgage was not in default at the time it began servicing the loan").

b.   <u>The Named Plaintiffs' Claims</u>

The Beals plaintiffs first obtained their loan from Countrywide, which Bank of America acquired on July 1, 2008.  (Second Am. Compl. ¶¶ 142, 230.)  The complaint does not state when the Beals plaintiffs defaulted on their loan.  The complaint generally alleges in its claim for relief that "BAC is collecting debt that was in default at the time it was obtained," but the complaint never indicates whether the Beals plaintiffs were in default when BAC obtained their mortgage.  (*Id.* ¶ 233.)  Even in plaintiffs' opposition to this motion to dismiss, they say only that "Plaintiffs allege that Defendants are servicing loans that were in default at the time they were acquired."  (Pls.' Opp. Br. Mot. Dismiss 28.)  The absence of an allegation that the Beals plaintiffs' loan was in default when defendants obtained it means that plaintiffs have failed to carry their burden of stating a claim under the FDCPA, as defendants are not a debt collector if plaintiffs defaulted only after the transfer.  Grullon's claim fails for the same reason; at no point does the complaint allege that he defaulted prior to the transfer of his mortgage.

Even assuming that plaintiffs defaulted before Bank of America acquired the loan, Bank of America is still a creditor and not a debt collector.  The statute provides that a party is not a creditor "to the extent that he receives an assignment or transfer of a debt solely for the purpose of facilitating collection of such debt for another."  15 U.S.C. § 1692(a)(4).  Although Bank of America would have become the owner of the debt after the default, it did not become the owner "solely for the purpose of facilitating collection of such debt for another."  This is not a situation where defendants received the debt from Countrywide to be collected on Countrywide's behalf or as compensation from Countrywide; rather, Bank of America wholly acquired Countrywide and now stands in its shoes.  In other words, Bank of America is not merely an assignee, it is Countrywide's successor.

34

Plaintiffs' cited cases are not to the contrary.  For example, in *Robbins v. Mortgage Electronic Registration Systems, Inc.*, 2009 WL 3757443, at *1, 5, the court held that the mortgage servicer could be liable under the FDCPA because the mortgagor was in default when the servicer began servicing the loan.  But there, the servicer merely purchased the original mortgagee's interest in the loan; it did not acquire the full company as Bank of America did.  In *Dawson v. Dovenmuehle Mortgage, Inc.*, No. 00-6171, 2002 WL 501499 (E.D. Pa. Apr. 3, 2002), the court stated that "the statute applies to a mortgage servicing company only where the mortgage at issue was already in default at the time when servicing began," but the court spoke in the context of dismissing the FDCPA claim of a plaintiff who had always been current with his mortgage obligation.  The court had no cause to elaborate upon whether the statute might not apply when the mortgage was already in default when acquired.

The principal case on which defendants rely, *Padgett v. OneWest Bank, FSB*, No. 10-08, 2010 WL 1539839 (N.D. W. Va. Apr. 19, 2010), is more persuasive because it represents a more apt comparison to the present circumstances.  There, the plaintiff acquired a mortgage from IndyMac, which OneWest Bank acquired after plaintiff defaulted.  *Padgett*, 2010 WL 1539839, at *1.  The court held that OneWest Bank was a creditor, not a debt collector, because it had not "obtained the plaintiff's mortgage 'solely for the purpose of facilitating collection of such debt,'" but rather took possession of all IndyMac's assets and deposits.  *Id.* at *15 (quoting 15 U.S.C. § 1692a).

Accordingly, because defendants were not debt collectors within the meaning of the statute, plaintiffs have not stated a claim for a violation of the FDCPA.

VI. <u>Conclusion</u>

For the foregoing reasons, this Court will not abstain from this case.  Defendants' motion to dismiss is granted as to all claims for negligent processing of a loan modification, as to all claims under the Fair Debt Collection Practices Act, and as to Grullon's claims for breach of contract and breach of the duty of good faith and fair dealing.  The motion is denied as to the Beals plaintiffs' breach of contract claim, the Beals plaintiffs' claim for a breach of the duty of good faith and fair dealing, all claims for fraud and negligent misrepresentation, and all claims under the New Jersey Consumer Fraud Act.

<u>/s/ Katharine S. Hayden</u>

November 4, 2011                                      Katharine S. Hayden, U.S.D.J.